UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

UNITED STATES OF AMERICA,)
            Government,  )
                        )
vs.                     )Cause No. 2:25-CR-003
DAVID DWAYNE KEELIN,    )
            Defendant,   )

_____

SENTENCING HEARING
BEFORE THE HONORABLE MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

NOVEMBER 4, 2025
AMARILLO, TEXAS

_____

A P P E A R A N C E S

FOR THE GOVERNMENT:
UNITED STATES ATTORNEY'S OFFICE
500 SOUTH TAYLOR STREET, SUITE 300
AMARILLO, TEXAS 7910
BY:  MS. ANNA MARIE BELL


FOR THE DEFENDANT:
FEDERAL PUBLIC DEFENDER'S OFFICE
600 SOUTH TYLER STREET, SUITE 2300
AMARILLO, TEXAS 79101
BY:  MR. ERIC COATS



FEDERAL OFFICIAL COURT REPORTER:
CHRISTINE M. ORR
205 SE 5TH AVENUE
AMARILLO, TEXAS, 79101
(806)468-3816

PROCEEDINGS RECORDED BY STENOGRAPHY; TRANSCRIPT
PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

**INDEX**

**PROCEEDINGS**                                          **PAGE**

COURT'S TENTATIVE DETERMINATION........    10

**SENTENCING EVIDENCE/ARGUMENT**

ON BEHALF OF THE GOVERNMENT............    10

ON BEHALF OF THE DEFENDANT.............    10

DEFENDANT'S ALLOCUTION.................    11

**IMPOSITION OF SENTENCE**

COURT'S STATEMENT OF SENTENCE..........    19

COURT'S STATEMENT OF REASONS...........    22

                * * * * * *

ADVISEMENT OF RIGHT TO APPEAL..........    30

REPORTER'S CERTIFICATE.................    34

                * * * * * *

[CALL TO THE ORDER OF THE COURT.]

THE COURT:  The Court calls criminal action number 2:25-CR-003-Z-BR-4, *United States of America versus David Dewayne Keelin*, for sentencing. Are the parties ready to proceed?

MS. BELL:  United States is ready, your Honor.

MR. COATS:  Defendant's ready, your Honor.

THE COURT:  Counsel for the United States is present.  Counsel for Defendant is present. Mr. Keelin, please acknowledge your presence in court today by stating your full name for the record.

THE DEFENDANT:  David Dewayne Keelin.

THE COURT:  From this point forward, you may participate seated or standing, whatever is most comfortable and consistent with the advice of counsel.  You appeared before United States Magistrate Judge Lee Ann Reno on July 2nd, 2025.  At that time, you entered a plea of guilty to Count VI of the Indictment, charging you with Possession with Intent to Distribute Methamphetamine, in violation of 21 U.S.C. Sections 841(a)(1) and 841(b)(1)(C). On that date, Magistrate Judge Reno found that your guilty plea was knowledgeable and voluntary and that

it was supported by an independent basis in fact, containing each of the essential elements of that offense.  You told her that you understood the elements of the offense.  You agreed to the accuracy of the Factual Resume.  And you admitted that you committed all essential elements of that offense. Accordingly, on July 17, 2025, this Court entered an order accepting your plea and adjudging you guilty of the crime alleged in the indictment.  This plea of guilty was entered pursuant to a written plea agreement, Factual Resume, and plea agreement supplement.  Pursuant to Section 6B1.2(a) and Rule 11(c)(1)(A), the Court has reviewed the plea agreement, the Factual Resume, the Indictment and the undisputed facts set forth in the PSR and thereby determined that the remaining charge does adequately reflect the seriousness of your actual offense behavior so that accepting your plea agreement will not undermine the statutory purposes of sentencing or the sentencing guidelines.  All relevant conduct having been taken into consideration in calculating the total offense level.  Therefore, consistent with Rule 11(c)(4), this Court accepts your plea agreement and the judgment and sentence will be consistent with it.

Now, Mr. Coats, did you and your client receive a timely copy of the presentence report and addenda?

MR. COATS:  We did, your Honor.

THE COURT:  And did you have a full and complete opportunity to review the PSR and addenda with your client?

MR. COATS:  Yes, sir.

THE COURT:  There are no written objections on file.  Does Defendant have any objections to the PSR or the addenda?

MR. COATS:  No, your Honor.

THE COURT:  Does Defendant adopt the facts and conclusions set forth in that PSR and addenda?

MR. COATS:  Yes, your Honor.

THE COURT:  Now, are you confident that your client understands every word, sentence and paragraph of that PSR as modified by the addenda?

MR. COATS:  I am, your Honor.

THE COURT:  Okay.  Ms. Bell, did the Government receive a timely copy of both the PSR and addenda?

MS. BELL:  Yes, your Honor.

THE COURT:  In a similar vein, the Government did not file objections but did timely

file in sealed document number 414 a statement of no objections to the PSR as currently written.  Does the Government have any untimely objections, responses or requested clarifications?

MS. BELL:  No objections, your Honor.

THE COURT:  Does the Government adopt the facts and conclusions set forth in the PSR and addenda?

MS. BELL:  Yes, your Honor.

THE COURT:  Let's take up acceptance of responsibility.  So pursuant to Section 3E1.1(b), this Defendant may qualify for a one-level deduction upon motion of the Government if he timely assisted authorities in investigating his own misconduct and timely noticed his intent to enter a plea of guilty. Here, PSR paragraph 38 reflects that the Defendant did both.  Does the Government move this Court to grant the one-level deduction for acceptance of responsibility?

MS. BELL:  Yes, your Honor, the Government so moves.

THE COURT:  The Court grants the Government's motion and will apply the third point for acceptance of responsibility in calculating the advisory guidelines range.  Now, there being no

objections, the Court adopts the findings and conclusions of the PSR and addenda in their entirety and the Court will note that the Government filed papers stating no objections to the PSR's application and calculation of the advisory guidelines range, and Defendant did not object to those calculations.  Here, the Court is applying the relevant federal statutes, the 2025 Guidelines Manual and the relevant policy stated therein.  That manual issued on November 1st, 2025.  The Court compared that newer manual to those that were in effect on the date of the instant offense and thereby determined that this newer Guidelines Manual will not violate Defendant's rights or the ex post facto clause of the constitution.

Mr. Coats, do you agree that the Court should use and apply the 2025 Guidelines Manual which issued on November 1st, 2025?

MR. COATS:  I do, your Honor.

THE COURT:  Any objection, Ms. Bell, to use of that manual?

MS. BELL:  No objection.

THE COURT:  Now, before correctly calculating and announcing the advisory guidelines range which must serve as our starting point, the

Court will note the considerable impact of the plea agreement and applicable statutory maximums noted in the PSR.  Here, Defendant could have faced a maximum sentence of life imprisonment had he been convicted on Count I or IV in the Indictment.  Additionally, Counts V or VII would have carried a 20-year -- they both carried 20-year maximums.  Additionally, an offense level of 37 and a Criminal History Category of V would have generated an advisory guidelines range of 324 to 405 months but for the statutory maximum of 240 months or 20 years.

Having considered the probation officer's calculations and conclusions in the PSR and addendum and there being no objections, the Court adopts those calculations and conclusions and thereby finds that the advisory guidelines range is as follows:  A total offense level of 37.  A criminal history category of V.  An imprisonment range of 240 months. A supervised release range of three years.  A fine range of 40,000 up to one million dollars. Restitution in the form of community restitution. Does Defendant have any objections to the Court's calculation of the advisory range?

MR. COATS:  No, your Honor.

THE COURT:  Any objection to the

calculations, Ms. Bell?

MS. BELL:  No objections.

THE COURT:  The Court will use and apply that advisory guidelines range as its starting point.  Let's turn to statements, arguments and allocution.  Ms. Bell, did the Government comply with any and all victim reporting requirements?

MS. BELL:  Yes, your Honor.

THE COURT:  Do you intend to present victim impact statements?

MS. BELL:  No, your Honor.

THE COURT:  Mr. Coats, the Court received timely character statements from the following persons:  Sharon Kay Miller, David Rowton, William and Angela Bass, Katherine Wilks, Flower Torres, Armando and Marsha Montoya, Sid Sal, Devonte Pierson, Richard James.  And also attached with those sentencing materials, certificates of achievement, baptism and recognition.  Do you intend to present any of these character statements through live testimony?

MR. COATS:  No, your Honor.

THE COURT:  And do you have any untimely character statements in written form?

MR. COATS:  No, your Honor.

THE COURT:  So let's turn to arguments. Here, the Court has tentatively determined that a sentence at the advisory guidelines range is appropriate.  But that's without prejudice to counsel making a different argument.  If you make an untimely motion for variance, you must use the 3553(a) factors.  If you make an untimely motion for departure, please recall that the newer 2025 Guidelines Manual abolishes many if not most guideline departures.  And also, any untimely motion may be denied simply because it's untimely.

With those guardrails in place, Ms. Bell, you may proceed.

MS. BELL:  Thank you, your Honor.  We request a sentence at the guideline range of 240 months.  We ask that this run consecutive to the pending parole revocation pending in Hall County. We would ask for a supervised release term of three years.  Thank you, your Honor.

THE COURT:  Thank you, Ms. Bell.  The Court will give appropriate weight to the argument of the AUSA.  I'll turn to the AFPD.  Mr. Coats, you may take as much time as you need.

MR. COATS:  Your Honor, with regard to the consecutive request of the pending parole

revocation, your Honor, we would ask that that be run concurrent as subject to the Court's jurisdiction, and we would ask for that -- make that request.  This is going to be a lengthy period of incarceration and sometimes a hold from the State does complicate a Defendant's security level and prevent him from participating in educational and religious services, and we would -- we would request that that run concurrent, as 20 years will be a long sentence, your Honor.

THE COURT:  Thank you, Mr. Coats.  The Court will give appropriate weight to your argument.  Now, Mr. Keelin, you have an absolute right to allocute at this sentencing hearing.  Allocution simply means you may tell the Court information you think is relevant to the sentencing decision.  You can read aloud a prepared written statement.  You can present facts and arguments for the Court to consider.  You have an absolute right to allocute, but you can never be forced to allocute.  Is there anything you would tell the Court at this time in the form of an allocution?

THE DEFENDANT:  Yes, sir, there is.  Okay.  I have a lot of regrets, but the first regret -- the main regret, when I was 16 years old, you know, I --

I was young.  I tried cocaine for the first time. And I didn't know at that time that it was going to have an invisible rope around my soul and keep dragging me down these roads and literally just -- I couldn't -- I couldn't escape it.  It's been a monster that -- that I've dealt with for a lot of years.  I've had some success, some -- some success, few years at a time, but until the last ten years of my life, I've had some really good success.  I joined a church.  I was growing in the church.  I grew a business, you know.  I was growing a business.  The business was growing.  I was doing things I had never done before.  I had a pastor. His name was Dale Miller that was leading me into -- into the church.  He -- he started out asking if I wanted to pass out Communion, and I said yes.  And then it went on to taking up the offering plate and then he -- after a while, he decided, you know, I guess he -- came and approached me and asked if I would do announcements at the church.  He was leading me into deeper and deeper water and, you know, I was comfortable with it, moving forward in it.  And then he came and asked me if I wanted to do regular ministry and I was like, you know, Dale, what about my history, and what are people going to

think?  He said David, I don't know that man.  And he -- he was in a sense Jesus in my life.  He gave me a chance and he was leading me into this thing and life was good.  I'm telling you, the beginning -- at the end of 2023, I had forgotten about the use of drugs, the use of alcohol.  First time in my life I was able to go buy a new truck and without anybody cosigning for me.  I mean, things were really good.  But then 2024 hit and life kind of fell apart for me.  It hit a really dark spot.  My pastor passed away and my mother got sick.  And she -- she was losing weight really quick.  I couldn't do anything about it.  I fought for her.  I did everything I knew to do, but I can remember when I was being a pallbearer for my pastor, carrying her casket -- carrying his casket to the gravesite, I knew I had to leave there and go to Amarillo because my mother was in ICU and -- here in Amarillo.  She -- her health declined rapidly.  I mean, all the stuff that went on.  I mean, with that, and I was trying to maintain my job because I had five guys working for me.  Those five guys represented five families.  They were my responsibility.  I needed to take care of them but also needed to take care of my mother, which was here in Amarillo.  She was at BSA

in ICU.  And I buckled into all this.  I buckled.  I succumbed.  I went back to drug use and that was my -- another biggest regret is -- I don't know how I did, but that's when I met Terry Noble. Biggest mistake of my life.  I regret the day I ever met the man.  But I started using, and my son -- my mother's in ICU on her deathbed.  My son took 350 ibuprofen.  I didn't know about it at the time.  I come back from ICU.  Came home.  It was about 2:30 in the morning.  At 5:30 in the morning, I got a knock on the door and it was the deputy sheriff.  I went to the door and he said your son's in his car unconscious.  He's taken a bunch of pills.  I didn't know how he knew that at the time, but I went out there.  Car was running.  Stereo was full blast.  He was unconscious.  I shook the car.  I beat on the car window, trying to wake him up and he wouldn't wake up.  The deputy said want me to break the back glass and I said yeah, let's do that.  He broke the back glass.  We got in the car.  We got him out. And about this time, the ambulance was pulling up. They got him on the stretcher.  And four hours later, he stopped breathing on his own.  They intubated him.  They brought him to Amarillo to ICU. I had my mom in one room and my son in another.  I

didn't know if my son was going to survive.  He spent nine days on life support, full life support.  I mean, it was -- I mean, it was just -- this whole thing was just -- thinking about all this, it breaks me down right now, but it was more than I could handle.  All this was more than I could handle.  I didn't know how to handle it.  Making sure I took care of my mom and making sure I got back.  Make sure guys at work had something to do for the day because they represented families and I felt responsible for them.  And I felt responsible for my mom and my son, and the hospital didn't know what to do.  They never -- they had never seen a case where someone taken 350 ibuprofen -- their closest case was a hundred.  And so they didn't know how to gauge what was going to happen to my son.  So it was touch-and-go.  Nine days into it, he finally came off the full intubation and full life support, but his eyes were looking -- I mean -- I didn't know if he had lost his mind.  I didn't know what would happen.  I didn't know -- still don't.  And through it, my drug use exploded.  I bought big amounts, yeah, because I didn't have time to go looking for any.  I wanted to make sure I didn't run out.  It was just more than I could handle.  And then we get

through that.  My mother passes away.  My son's still in the hospital.  I get him out of the hospital and go to the funeral, we take care of that.  We get her back.  Get him back in the hospital because he was in there for 90 days.  He was in there for three months, recovering -- when he came off the -- as he was coming around, as he was coming back to himself, he was seeing everybody as orange.  I was orange to him.  Everybody was orange.  And I thought he -- thought he messed up his mind.  He's a very intelligent kid and he just -- all this stuff is just terrifying.  And then as soon as that gets finished, I get a call -- the girl that I was living with, she had been having headaches.  And they take her to the hospital and they do a CAT scan and they found a brain tumor the size of my fist in her brain.  And I didn't know if she was going -- I didn't know what was going to happen with that.  She had been bumping into walls.  And anyway, I drove to San Angelo and they did emergency surgery and, you know, who knows what's going to happen after that.  She going to have to have speech therapy.  She's going to have to learn how to walk again.  No one knows.  I mean, but 2024 was a nightmare for me and I was just trying to survive.  And I could tell you

I had no involvement with what Terry Noble was doing. I was there that day, but he admitted fully that the 23 kilos of methamphetamine was his. I admitted for you that the cocaine was mine. I -- I mean, I had nothing -- I had nothing to do with his operation. I had something to do with my operation. And that was trying to take care of my wife and my family. I'm not -- I'm not fighting the plea. I'm not fighting it at all. I'm just saying that I had nothing to do with Terry Noble's operation. Nothing. I'm regretting even knowing that man. I made some mistakes in there. I just -- I was just trying to survive 2024. And that's where all this kind of fell apart. It all came together.

But since then, I got here in the county jail. I repented. I went back to my roots. I prayed to God. I've read the Bible five times since I been in there. I got baptized. Baptized in April, April 21st. Baptized in Holy Spirit. September 17th, I took the GED pre-exam just to do it. I've done Bible studies. I really focused on trying to go back the other way. I -- I regret what I did. I have full remorse for what I did. And I just wanted to lay that out and let you know that I didn't mean any true criminal act. I was just

trying to survive.

THE COURT:  Thank you, Mr. Keelin.  The Court will give appropriate weight to your allocution.  And later, at a different phase and separate from the Court's weighting of the 3553(a) factors, the Court will take recommendations for your continued care, education, training.  I know that you're facing a lengthy sentence.  I want to make specific recommendations, including recommendations for any mental health counseling and treatment given that history and other history reflected in the PSR.  Something like PTSD counseling or something to help you deal with those myriad traumas that all converged on you.  If you have particular requests for programming or treatment or counseling or anything that can help with that, I want to give Mr. Coats the widest possible latitude to make those recommendations.  That, too, is part of this process.  It simply happens towards the end of the hearing.  So if we need to make particular recommendations, I'll order the microphones disabled, and you can have that attorney-client communication.  Do you understand?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  With that, Mr. Coats,

do you know of any reason why lawful sentence cannot be imposed?

MR. COATS:  No, your Honor.

THE COURT:  Any reason known to the Government?

MS. BELL:  No, your Honor.

THE COURT:  Having considered the permissible factors at 18 U.S.C. Section 3553(a), the advisory sentencing guidelines, the conduct admitted in the Factual Resume, the capable and effective assistance of defense counsel which significantly reduced Defendant's potential sentencing exposure which could have gone as high as life imprisonment and all mitigating and aggravating factors, it is the judgment of this Court that the Defendant, David Dewayne Keelin, is hereby committed to the custody of the Federal Bureau of Prisons for 240 months.  That represents a sentence at the advisory guidelines range.  The Court does not order a fine because Defendant lacks the financial resources or future earning capacity to pay a fine. But the Court does order a one-time mandatory special assessment of one hundred dollars which is due and payable immediately.

And because the Court agrees with the

defense counsel's reasons and arguments, this sentence shall run concurrently to any sentence that may be imposed in Case Number 6310 presently pending in the 100th District Court for parole violation that is unrelated to the instant offense.  The Court agrees with the Government that typically unrelated offenses should run consecutively; but here, the Court is exercising its sentencing discretion to run the sentence concurrently.  The Court does not order restitution because there are no identifiable victims other than society at large.

Regarding supervised release, having made the required individualized determination under the new 2025 Guidelines Manual, the Court further orders that upon release from imprisonment, Defendant shall be placed on supervised release for a term of three years.  While on supervised release, Defendant shall comply with the mandatory conditions listed at Section 3583(d) and Section 5D1.3(a), the standard conditions listed at Section 5D1.3(c) and the following discretionary, special and additional conditions derived from Sections 5D1.3(b), (d) and (e) of the Guidelines Manual.  Number one, the Defendant shall participate in an outpatient program approved by the probation officer for treatment of

narcotic, drug or alcohol dependency that will include testing for the detection of substance use, abstaining from the use of alcohol and all other intoxicants during and after completion of treatment and contributing to the costs of services rendered copayment at a rate of at least $20 per month.

Mr. Coats, did you and your client receive a timely copy of the written notice of intent to impose conditions of supervised release?

MR. COATS:  We did, your Honor.

THE COURT:  Did you have a full and complete opportunity to review that document with your client?

MR. COATS:  Yes, sir.

THE COURT:  And did you fully explain all of the conditions of supervised release, including the discretionary, special and additional conditions appearing on written page four and pronounced orally at sentencing?

MR. COATS:  Yes, sir.

THE COURT:  And does your client have any objections to any of the conditions of supervised release?

MR. COATS:  No, your Honor.

THE COURT:  And Mr. Keelin, do you agree

to abide by and adhere to the conditions of supervised release stated in this written notice and pronounced aloud with special attention to those discretionary, special and additional conditions appearing on page four?

THE DEFENDANT:  Yes.

THE COURT:  And Ms. Bell, did the Government receive a timely copy of that notice?

MS. BELL:  Yes, your Honor.

THE COURT:  Any objections?

MS. BELL:  No objections.

THE COURT:  The Court did receive and did review a fully executed copy of the notice.  It is dated November 4th, 2025.  It bears the signature of the Defendant, defense counsel and this Court.  It is made a part of the record in this case and in any record on appeal.  The notice and conditions of supervised release stated therein are hereby adopted, ordered and imposed as just pronounced by the Court.

The Court will now enter its statement of reasons.  Here, the sentence is sufficient but not greater than necessary to comply with the statutory purposes set forth at 18 U.S.C. Section 3553(a) specifically.  First, Section 3553(a)(1).  Here, the

history and characteristics of the Defendant includes myriad drug-related offenses.  Defendant has five prior convictions for Possession of a Controlled Substance as detailed in PSR paragraphs 54, 56, 57, 59 and 60.  Those offenses involve Possession of Cocaine and Methamphetamine. Defendant also has a prior conviction for DWI and Driving While License Suspended.  The Court considers this history and these characteristics aggravating in this case and weighting in support of the guidelines sentence.

Second, Section 3553(a)(1) and (a)(2)(A), which requires the Court to consider the nature and circumstances of the offense, to reflect the seriousness of and to provide just punishment for the offense.  Here, that offense involved months of distributing cocaine and methamphetamine through Memphis, Texas, and trafficking it into and through the Amarillo Division.  On April 14, 2024, officers conducted a traffic stop on a vehicle driven by Defendant which revealed nearly 20 kilograms of methamphetamine and nearly a kilogram of cocaine which Defendant aided co-defendant, Terry Noble, in trafficking.  That same day, officers found 852 grams of cocaine and 1.23 kilograms of

methamphetamine in Defendant's own residence. Defendant admitted to distributing drugs throughout Memphis, Texas, since December of 2023.

Even after that encounter with law enforcement, Defendant continued to distribute methamphetamine.  On August 1st, 2024, officers performed a traffic stop on Defendant's vehicle after a confidential source arranged to purchase one pound of methamphetamine from Defendant.  Officers found 336 grams of methamphetamine in his vehicle and a subsequent search of his residence yielded approximately 224 grams of methamphetamine and 287 grams of cocaine as detailed in the unobjected PSR paragraph 32.

Given the quantity, quality and potential lethality of the drugs involved and the length of Defendant's trafficking enterprise, the Court finds that these 3553(a)(1), (a)(2)(A) factors and facts are aggravating in the extreme and weight in favor of the guidelines sentence.

Third, Section 3553(a)(2)(A), (a)(2)(B) and (a)(2)(C) which requires the Court to promote respect for the law, to afford adequate deterrence to criminal conduct and protect the public from further crimes of the Defendant.  Here, Defendant

continued in the drug distribution enterprise even after confrontation by law enforcement.  The Court finds Defendant would have continued spreading methamphetamine and other poisons throughout Texas but for the intervention of law enforcement.  The Court finds these 3553(a)(2)(A), (a)(2)(B) and (a)(2)(C) factors and facts aggravating in the extreme.

Now, regarding supervision, after making the required individualized determination pursuant to the new 2025 Guidelines Manual, the Court imposed a term of supervised release for added deterrence and protection.  Specifically, the Court imposed the term of three years of supervised release because as stated in PSR paragraph 128, 21 U.S.C. Section 841 (b)(1)(C) mandates such a term.  The Court further refers to Defendant's long history of drug use and abuse as noted in the statement of reasons and throughout the PSR.

In light of the Fifth Circuit's opinion in *Diggles*, the Court adopted, imposed and ordered the discretionary conditions because they are consistent with Section 3583 (d)(1), (d)(2) and (d)(3), and Court expressly states that the discretionary conditions involve no greater deprivation of liberty

than reasonably necessary, consistent with 3553(a)(2)(B), (a)(2)(C) and (a)(2)(D). Regarding that individualized determination. And in addition, the Court imposed the discretionary condition pertaining to substance abuse treatment because PSR paragraphs 99 through 110 illustrate Defendant's long history of addiction, and that pattern of addiction was even referenced in Defendant's allocution. The Court finds Defendant will benefit from supervision that provides accountability and incentivizes him to receive treatment and to return to sobriety. That is the Court's statement of reasons.

Mr. Coats, does Defendant have any objections to that statement?

MR. COATS: No, your Honor.

THE COURT: Any objections from the Government?

MS. BELL: No objections.

THE COURT: The Court hereby orders the sentence imposed as stated. Finally, even if the correct advisory guidelines range was not considered, this Court would have imposed the same sentence for the same reasons, regardless and irrespective of the applicable advisory guidelines

range.

Now, Mr. Coats, as I explained to Defendant and as you well know from now hundreds of cases before the Court, this is the time where we can make those medical recommendations, vocational recommendations and residential recommendations to assist Defendant during this term of incarceration. I want to address the purely medical conditions of hypertension, ophthalmological issues and dental problems. I intend to make a medical evaluation recommendation for that. And then given Defendant's allocution and the documented history of substance abuse, I want to make the most intensive recommendation for drug rehabilitation.

Do you have any additional requests for mental health treatment given the myriad traumas that befell Defendant during 2024, something like grief counseling or PTSD counseling?

MR. COATS: Yes, your Honor.

THE COURT: Okay. Any objection, Ms. Bell?

MS. BELL: No objection.

THE COURT: The Court emphatically recommends that Defendant be allowed to participate in a mental health evaluation to identify possible

treatment for the traumas reflected in the sentencing transcript, including PTSD and grief. The Court also recommends an intensive medical evaluation and possible consideration for placement in an FMC, if necessary, to treat the hypertension, eye problems and dental problems reflected in PSR paragraphs 89 through 110.  Most importantly, the Court recommends the most intensive drug rehabilitation deemed consistent with his security classification and eligibility.  If possible, something like a residential program if Defendant ever qualifies.

On vocational training, Defendant is interested in HVAC training; is that correct?

MR. COATS:  Yes, your Honor.

THE COURT:  Any other vocational fields that you would request?

MR. COATS:  We would just ask that he be eligible if a field arises.

THE COURT:  I'm sorry.  I -- I don't have LiveNote, so I may need you to repeat that.

MR. COATS:  We just ask that he be eligible for any training that he -- meets his security classification.

THE COURT:  Okay.  Any objection?

MS. BELL:  No objection.

THE COURT:  This Court does recommend HVAC training consistent with PSR paragraph 113 and then also any other vocational training consistent with his security classification and eligibility, and the Court finds that the Defendant is an excellent candidate for continued training given his manifest intelligence and also his work history and work ethic.

Now, regarding residence, I know Defendant was grieved by caring for ailing family members.  It appears through this sentencing process and also a series of character statements that friends and family are important to Defendant.  Is that the priority in selecting a residence?

MR. COATS:  Yes, your Honor, but he does have a daughter near the Dallas area.  And so he is requesting the Seagoville Unit for the safety there and also programs available.

THE COURT:  Okay.  Any persons or organizations that should be identified for separation?

MR. COATS:  No, your Honor.

THE COURT:  Okay.  Any objection, Ms. Bell?

MS. BELL:  No objection.

THE COURT:  This Court does recommend that the Defendant be allowed to serve this term of incarceration at FCI Seagoville in the Dallas Division, and this is to prioritize proximity to family and friends, especially those that submitted character statements.

Are there pending indictments or charges to dismiss?

MS. BELL:  Yes, your Honor.  The Government moves to dismiss Counts I, IV, V and VII of the Indictment as to this defendant only.

THE COURT:  The Court grants the Government's motion and orders Counts I, IV, V and VII of the Indictment to be dismissed as to this defendant only and pursuant to the judgment.

Let's turn to remaining rights of appeal. Is Mr. Keelin, under your plea agreement, you have waived the right to appeal this sentence or contest same in a collateral proceeding with four exceptions.  Number one, you may directly appeal an arithmetic error at sentencing.  Number two, you may directly appeal a sentence exceeding statutory maximum.  Number three, you may challenge the voluntariness of your guilty plea.  Number four, you

may claim ineffective assistance of counsel.

Now, if you decide to appeal, your notice of appeal must be filed with this Court within 14 days of the date judgment is entered in your case or within 14 days of the Government entering its notice of appeal. Also and importantly, if you decide to pursue that appeal, you have an absolute right to apply for leave to appeal in forma pauperis. This is sometimes abbreviated I.F.P. If I.F.P. status is granted, you may be allowed to pursue that appeal at no cost to yourself.

And Mr. Coats, did you and your client receive a timely copy of the notice of right to appeal?

MR. COATS: We did, your Honor.

THE COURT: Did you have a full opportunity to discuss and explain Defendant's rights of appeal?

MR. COATS: Yes, sir.

THE COURT: And does he have any objections to the appellate rights arising under the plea agreement, including the appellate waiver?

MR. COATS: No, your Honor.

THE COURT: Any objection to the appellate rights described in this notice?

MR. COATS:  No, sir.

THE COURT:  And did you specifically explain the 14-day period that applies to the notice of appeal?

MR. COATS:  I did, your Honor.

THE COURT:  Ms. Bell, did the Government receive a timely copy of that notice?

MS. BELL:  Yes, your Honor.

THE COURT:  Any objections?

MS. BELL:  No, your Honor.

THE COURT:  This Court did receive and did review a fully executed copy of the notice of right to appeal.  It is dated November 4, 2025.  It bears the signature of the Defendant, defense counsel and this Court.  It is made a part of the record in this case and in any record on appeal.  And Mr. Keelin, I will caution you that this notice of right to appeal has a similar title to the notice of appeal, but those are different documents.  If you intend to file a notice of appeal, please consult with counsel.  He can explain the documents and the deliverables.

Is there anything further from the Government?

MS. BELL:  No, your Honor.

THE COURT:  Anything further from the Defendant?

MR. COATS:  No, your Honor.

THE COURT:  Mr. Keelin, I know you have had family that endured several hearings today and they've waited patiently in the gallery to stand by your side.  I want to give you a moment to reunion with those family members.  I just have very strict instructions for all of the participants.  Any family must remain fixed in the gallery at all times.  You may not approach the Defendant.  And for the Defendant, you must stand on this side of the gallery bar.  And that's just to protect you, family, the marshals, all involved.  So I do want you to orally communicate and have an opportunity to reunion.  I know your care for that family weighed heavy on you at many moments discussed today, so I do want to afford you that time to reunion with family.

THE DEFENDANT:  Thank you.

THE COURT:  It's also my intention to never again see you in federal court, so please make good use of this time.  I know it's a lengthy sentence, but the federal system is different than other systems you have seen.  We have the resources

to make good on the promises that we make through various programs and policies.  So if you maintain a good relationship with the Bureau of Prisons, you can be restored through this process and you can receive the treatment and care that you deserve.  So that's my intention.  Please maintain the best possible relationship with the Bureau of Prisons and be restored through this process.  With that, the Court stands adjourned and the Court is adjourned for the remainder of the day.  Counsel are excused.

[PROCEEDINGS CONCLUDED AT 2:02 P.M.]

* * * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  I further certify that the transcript fees format comply with those prescribed by the Court and the Judicial Conference of the United States.

*/s/ Christine M. Orr, RPR,*          12-29-25
 Official Court Reporter             Date